COMMERCIAL LIQUIDATION CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14045. Promulgated May 14, 1929.

*Spencer F. Harris, Esq.*, for the petitioner.
*L. A. Luce, Esq.*, for the respondent.

**OPINION.**

MILLIKEN: Petitioner contends that its status as a personal service corporation was fixed by the letter of the respondent, copied in the findings of fact, granting that classification for the year 1918.

In the recent case of *Atlanta-Southern Dental College*, 15 B. T. A. 1325, the same question was raised and the Board there said:

The petitioner contends that, having been granted personal service classification for the preceding taxable years 1918, 1919, and 1920, when it operated substantially the same kind of a business under similar conditions, including the employment of substantially the same professors, it should be granted

personal service classification in this proceeding. We do not agree with such contention. The granting of a special classification for one year does not of itself warrant the granting of that classification for a succeeding year. *Enameled Metals Co.*, 14 B. T. A. 1392; *Standard Rice Co., Inc.*, 13 B. T. A. 338.

The letter of the respondent granting personal service classification for 1918 is not controlling and this question is decided adversely to the petitioner.

In order to entitle it to be classified as a personal service corporation, petitioner must show (1) That it is engaged in rendering personal service as distinguished from trading, merchandising or manufacturing; (2) that the principal stockholders are regularly engaged in the active conduct of the business; (3) that capital, whether invested or borrowed, is not a material income-producing factor; and (4) that the income may be ascribed primarily to the activities of the principal stockholders.

The petitioner manifestly was a one-man corporation. Walter F. Schelp, the president and manager, owned 4,998 shares of its stock and the other two shares were held by employees to qualify them as directors. The former devoted his entire time to business of petitioner. The evidence does not show what the duties of Mr. Schelp were, nor does it indicate in any way what he did to obtain business or to earn income in the performance or carrying on of the business. So far as the record shows, the business may have been just as large and just as profitable without him as with his assistance. The business of the company was obtained primarily by the efforts of the solicitors or salesmen, who during the year brought $97,803.90 into the gross income of the company.

We think the facts of this case bring it within our decision in the case of *Meinrath Brokerage Co.*, 12 B. T. A. 113, and the cases therein cited. It was there said:

It remains for us to determine whether petitioner's income may be ascribed primarily to the activities of the principal stockholders. During the years herein involved petitioner had from 89 to 140 employees. Of this number from 7 to 9 were office managers who received compensation ranging from $1,100 to $10,952.74, and from 27 to 39 were salesmen whose compensation ranged from $1,000 to $6,000. The remaining number of employees were general clerks, file clerks, stenographers, etc. The employees outnumbered the stockholders from 6 to 10 times. The salesmen and office managers outnumbered the stockholders from 2 to 3 times. Total salaries paid to employees far exceeded total salaries paid to stockholders. In 1920 salaries were paid to employees in an amount 3 times that paid to stockholders. In Appeal of *Patterson-Andress Co.*, 6 B. T. A. 392, we stated:

" * * * We do not mean to hold that personal service classification must be denied in all cases were there are employees under the supervision of stockholders, but where, as here, employees so greatly outnumbered the stockholders and there is no evidence of the character of the service performed by

most of them and they receive substantially one-half of the earnings over the expenses other than salary. we can not find that the income is to be ascribed primarily to the activities of the stockholders. In our opinion this clause means more than that the stockholders shall obtain the clients and supervise the work, or that clients shall look to their experience; it means, among other things, that the corporation may not rely upon non-stockholders to do a substantial amount of the work which produces the income whether such work be detailed or supervisory. Just as another clause excludes from personal service classification those corporations where capital contributes materially to the income, so does this clause exclude corporations where the services of employees so contribute."

See also *Albrecht & Weaver, Inc.* v. *Commissioner*, 9 B. T. A. 560, 565.

The discussion of the Circuit Court of Appeals in *Metropolitan Business College* v. *Blair*, U. S. C. C. A., 7th Cir., February 16, 1928, is particularly applicable in the instant case:

" If this were a prosperous manufacturing corporation, employing many skilled workmen and capable foremen, salesmen, and the like, it could not be said that the corporate income was primarily attributable to the activities of the few others who, in managerial capacity, successfully planned and dominated the corporate affairs. The absolute indispensability of a competent working force would be too apparent to ascribe to management primacy of influence in producing corporate income.

" The teaching body is here a skilled working force, without which the income would have been restricted to such as would arise from a student body which these three men alone might handle. Stenographers, messengers, and others serving them in personal capacity, might well be said to be incidental to the management, and such service would not prevent the conclusion that the personal activities of the managing stockholders were a primary factor in producing the income.   *   *   *

" Probably petitioner's very success is ascribable largely to wisdom in the choice of competent teachers; at least it may be safely said that the petitioner would be the first to resent the imputation that its teachers were mere rubber stamps or talking machines."

Petitioner contends that its income results primarily from the activities of the stockholders in securing offerings of merchandise and distributing same for sale, and that selling was less difficult and of secondary importance. We are not inclined to agree with this contention. A very attractive factor of petitioner's business was its capable selling organization, which was no doubt influential in causing principals to market their products through petitioner's agency.

The stockholders of petitioner exercised supervision over the office managers and salesmen. When offerings of merchandise were received and allocated to the various territories, one of the executive stockholders would telephone its territorial office manager and inform him that he should sell a certain quantity of merchandise at a certain price. Market information and sales arguments were also thus dispensed and transmitted to the salesmen. It remained necessary, however, for the salesmen to call on the trade and sell the offerings, and undoubtedly petitioner's volume of sales depended largely upon the ability and industry of its salesmen.

We are of the opinion that petitioner's income can not be ascribed primarily to the activities of the principal stockholders, and that classification as a personal service corporation should, therefore, be denied. *Louis Hilfer Co.* v. *Commissioner*, 9 B. T. A. 1264.

In the instant case there were in all about 45 or 50 employees who received $94,061.65 as compensation, and there were three officers and shareholders whose compensation was $10,962.50. Under these circumstances we hold that the income of the petitioner can not be ascribed primarily to the activities of the principal stockholders and personal service classification must be denied. See also *Biscayne Engineering Co.*, 15 B. T. A. 90, *Infant Incubator Co.*, 12 B. T. A. 449, *Atlanta-Southern Dental College*, 15 B. T. A. 1325.

The remaining question relates to the right of petitioner to deduct from gross income the amount added to the reserve fund during the taxable year. At the hearing counsel for petitioner stated his theory as follows:

My theory is that it never became the company's money until after the period of the guarantee had expired, to see whether or not it was consumed.

We can not agree to this theory. Obviously, the money belonged to someone. The client had paid it over to petitioner and parted title with it. Under the contract with the surety company the petitioner had pledged the money to secure a contingent liability and the surety company merely had a lien upon it. The transaction was just the same in legal effect as if the petitioner had purchased Liberty bonds or other securities and pledged them as collateral security. In such case the securities would be the property of the petitioner and in this case clearly the petitioner is the owner of the reserve fund and it formed part of its gross income when collected from its clients.

It is not shown that there were any disbursements from this fund during the taxable year, or that petitioner became liable for any refunds to its clients, or any payments by the surety company on that account, and the question arises, May petitioner deduct this reserve against contingent liability as an ordinary and necessary business expense?

The case of *Hanff-Metzger, Inc.*, 4 B. T. A. 1214, was that of an advertising agency that set up a reserve for short-rates. The agency contracted with publications for a large amount of space for a specified period of time at a reduced rate. In the event it did not use all the allotted space it was to be charged a higher rate. To meet this contingent liability it set up this reserve, for which it asked deduction, which was denied by the Board as follows:

With respect to the item oil reserve for short rates, the taxpayer contends that this is not income but an increase in its liabilities. This contention, on its face, is unsound. The funds for which this reserve was created were collected by the taxpayer from its clients as a regular part of its business. There does not seem to have been any distinction made, at the time of collection, in billing clients or otherwise, between the amounts which were admittedly income and the amounts placed in the reserve. As far as the record shows, this seg-

regation of receipts was a voluntary act on the part of the taxpayer, for the purpose of providing funds from which payment could be made upon completion of the contract either to the publisher, if the lower rate had not been earned or to the advertiser, if all the space contracted for by the taxpayer had been used. The question of the deduction of reserves has been before the Board in a number of cases. In the *Appeal of William J. Ostheimer*, 1 B. T. A. 18, 21, we said:

"The revenue laws prior to the 1921 Act have never recognized reserves as being deductible from gross income in determining net income except in the case of insurance companies. * * * The statute specifies what deductions are allowable and, except in the case of insurance companies, no provision is made in the 1918 Act for the deduction of a reserve as such. Items of expense must actually have been paid or liability therefor incurred in order to be deductible under that Act."

The same conclusion was reached in *Thatcher Medicine Co.*, 3 B. T. A. 154, reserve against freight and advertising refunds; *Monarch Cooperage Co.*, 13 B. T. A. 929, freight rebates; *Maney Milling Co.*, 14 B. T. A. 1001, possible increase in electric service charges; *Uvalde Co.*, 1 B. T. A. 932; and *Harrison* v. *Heiner*, 28 Fed. (2d) 985, where contractors had agreed to maintain and keep in repair street improvements for a number of years and set aside a reserve to meet such contingent liability.

It is not shown whether taxpayer kept its books on the cash receipts and disbursements basis or the accrual basis. If they were kept on the cash basis, the petitioner is not entitled to any deduction for the reserve fund, because it has not shown that any part thereof was paid out during the taxable year. On the other hand, if the accrual method was used it would be necessary for petitioner to show that it had actually become liable for refunds during the taxable year, which has not been done.

*Judgment will be entered for the respondent.*